THOMAS S. COADY and ALONZA CHEESEMAN, liquidating trustees for the Coady & Cheeseman Company, a dissolved corporation, complainants,

*v.*

LUIGI CICCION, defendant.

[Heard and determined June 23d, 1924.]

**Contracts—Reformation—Question of Sale of Lands—Evidence Examined and Decree for Complainants, Court Holding That Defendant Thereby Gets What He Bargained for.**

On bill, &c. On final hearing.

*Mr. Francis J. Smith* and *Mr. Charles A. Cogan,* for the complainants.

*Mr. Charles W. Letzgus,* for the defendant.

LEAMING, V. C. (orally).

Gentlemen, since you wish my best judgment in this matter without being enlightened further by argument of counsel, I will tell you what my convictions are from the testimony in a very few words; the real issue is an issue of fact.

It is perfectly clear, and of it there can be no doubt in my mind, that it was the understanding of the complainants that they were simply selling these two houses with the two eighteen-foot lots on which they stood. There cannot be any doubt about that. Even Lugui, the defendant, by this time must be satisfied that that was their understanding, and if, in fact, they said anything that led him to a contrary view, it was because they were not comprehending the situation: because it isn't reasonable to suppose that they would come here for the sake of this forty-four feet, I think it is, in dispute, and swear that they understood they were selling only thirty-six feet, if, in fact, they understood they were selling sixty feet. I don't believe anything of the kind, and I don't believe even Lugui, in his most sanguine moments, thinks the

complainants are not sincere in their testimony, that they understood they were selling only thirty-six feet. It may be that the defendant is sincere at this time in what appears to be his present belief that at the time he made the bargain he thought he was buying sixty feet, but I don't believe, and can't believe, he thought so at that time; but he has read the agreement, and the agreement calls for sixty feet; he has thought that over many times; it is there in writing, clear and distinct, and it may well be that he believes at this time and has fully convinced himself that he thought he was buying sixty feet at that time.

Of course, there is some testimony that cannot be reconciled. He said that Mr. Coady was down at his house to deliver the agreement which he already signed, and that Coady read the agreement to him, and read it sixty feet that night. That may have happened, but it is a very unnatural and a very illogical thing to have happened. I can't conceive that Luigi would go into Mr. Cogan's office with these other parties and execute this agreement in duplicate, or even without them, and go away without his copy. The other parties had already signed, or signed at the same time, and there was no occasion for his doing that, and Mr. Cogan is postitive that he did not. If he took that agreement away with him, or his copy, the circumstance he testified to, and that his wife corroborates, could not have occurred. There is another feature of the case which, to my mind, is even more important: here were two bungalows, or rather a twin bungalow, located on a property bounded by a fence on either side—that is, fences equally distanct from the buildings. It is true the fence on the far side from the land owned by Luigi did not extend the full length of the lot, but it extended all the way from the rear of the lot out to a point opposite the rear part of the building, and the only reason it did not extend all the way to the street was because of anticipated building operations on the other lots, showing clearly it was intended by the complainants to utilize the other lots for building purposes, and that they were not selling those lots. How could they foreshorten that fence to make room for future building operations on the adjacent

lot if they were selling the full sixty feet which would embrace the adjacent lots? So, it is admitted that the buildings which defendant purchased were fronting on Jersey avenue, with a fence on either side—the two fences being thirty-six feet apart—and, in addition to that, building operations were in progress on the other lots—the lots now in controversy—which had extended to the excavation of cellars; so it seems incomprehensible that any person, however ignorant they may have been in their ability to read or write, or in their lack of education, could have helped but discerned and known that in buying those twin bungalows the land that would naturally, appropriately and properly go with them would be the land between those two fences, and would not include the land beyond, which was already being excavated for other buildings. I cannot see how Luigi could have thought for a moment he was buying any more land on the far side of the building than he was on the side of the buildings next to him, about six feet, I think it is, and the fence was about six feet on the other side, and that was a proper, reasonable and natural amount of land to go with those twin bungalows. It would have been most extraordinary to have sold two bungalows like those and include thirty feet on one side of the bungalows and six feet on the other. Of course, the additional twenty-four feet, now claimed by defendant, could have been utilized by him for building purposes, but that twenty-four feet would not appropriately go with the sale of those twin bungalows, and that is what the sale was; it was not in any sense a land purchase—it was a bungalow purchase. At first defendant only anticipated buying one of the bungalows, No. 820, and it wasn't until he was persuaded it would be advantageous to him to buy the other bungalow that he concluded to buy that, so he wasn't buying for a land speculation, with the idea of getting more ground so he could build other bungalows or sell land, but he was after the bungalows; he was first after one, and then agreed to take two, and the thirty-six feet, eighteen feet for each bungalow, was a proper and reasonable amount of land to go with them, and it is impossible for me to believe that defendant had any other thought or purpose.

I think the truth is, as Mr. Cogan has testified, that he was the villian. He has made a blunder that was vastly against his own clients' interests and very much in favor of the interest of the other side, and it isn't very much of a strain upon human nature for defendant to now want to take advantage of it, and, perhaps, convince themselves that, after all, that was their idea from the beginning. I doubt it. I doubt whether Luigi ever had any sixty feet thought in his mind as to the amount of land he was purchasing until after it was discovered that there was a mistake. It was a natural enough mistake for Mr. Cogan to make; he had already drawn the two building and loan association mortgages, each on one of the bungalows, eighteen feet of land for each, and if he hadn't been dreaming of his future glories, and recalling some of his past victories, and mooning more or less, he would have drawn the agreement to cover the same land which it was intended to cover, but somehow or other his brain did not work normally, it got muddled, and he made what in common parlance was a "bull," and, after getting the descriptions right in the mortgages, evidently copied the description in the agreement from the old deed and called it sixty feet instead of thirty-six. It was an easy mistake to make if one was dreaming. The descriptions are identical in every other respect; the numbers of the lots are given, which are the house numbers, and every course and distance is the same in both descriptions, the one that is in the agreement and the one the complainants say was intended, excepting that one course of sixty feet in width, so that the error is the word "sixty" instead of the word "thirty-six" occurring on the back line and on the front line of the lot. It is impossible to contemplate Mr. Cogan's conduct in drawing the two building and loan association mortgages specifically and accurately on the eighteen-foot lots and reciting in the agreement that the agreement covered the same property referred to in those mortgages, referring to the mortgages as "covering the same property above described," without concluding that he, in his mnd, thought that the property here described in this agreement was the property he had mortgaged, which was thirty-six feet. So, everything I find in the

case, from one end to the other, indicates to my mind that all the parties to this agreement understood that what was being sold and what was being bought was two bungalow lots, each lot covering a bungalow with about six feet of land on either side, making eighteen-foot lots. I think, perhaps, it was four feet, someone testified that between the bungalows and side lines it was four feet instead of six, I think. However, that is immaterial. These tax bills are really of no importance, anyway. I wish we could judge titles by the conduct of tax assessors, it would save me a lot of work. As a matter of fact, they do get things right sometimes, but seldom. This is a case where they hadn't gotten even where either side contend. For instance, in the tax bill of 1920, they have "bungalow property 30 x 120," marked as "block 114, lots 7 and 8," and they have for the same year another bungalow property "30 x 120, lots 8 and 9." Now, that is impossible, they have got part of one bungalow in twice, but that is simply an error on the part of the tax collector that doesn't amount to anything.

I am convinced there must be a decree in this case for complainants, reforming this agreement by changing the word "sixty" to the word "thirty-six." I think Luigi will thus get what he really bought, what he bargained for, and what at the time he thought he was getting. I think that since then he has worked himself into the belief that at that time he thought he was getting more, because his agreement reads that way. In fact, much of the testimony of Mr. Hambleton indicates pretty strongly in my mind that Luigi was not over-vigorous in his earlier assertions and impressions that he was entitled to sixty feet; he has become more strengthened in that view as time has gone. Some of the testimony of Mr. Cheesman touching his unrefuted accusations to Lugui that he was not playing fair in this deal indicates strongly that was true, and that in the earlier stages Luigi was not very persistent in his sixty-foot claim. I can understand when Mr. Letzgus saw the papers and heard Luigi's story he was satisfied he had an impregnable case.

I will advise a decree reforming the agreement in accordance with the prayer of the bill.